OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
This proceeding illustrates the need for immediate legislative action to strengthen the power of the Family Court in reviewing the appropriateness of the initial voluntary foster care placement of a child. For here, a natural mother, with the aid of the New York City Department of Social Services, improperly utilized the foster care system to shun her responsibilities as a parent and to punish her 10-year-old son for running away from home. Despite the obvious prejudice to the child and the overburdened taxpayers, the present law offers no judicial recourse to either. Nor is there any sanction prescribed to deter something like this from happening again.
This is an application by the Commissioner of Social Services of the City of New York for judicial approval of a voluntary placement instrument dated May 13, 1983, whereby the mother of 10-year-old William S. placed the child in foster care.
The sole witness at the fact-finding hearing was the caseworker from Special Services for Children who witnessed the signature of the natural mother. She testified that William had run away from home and that, upon his return, the natural mother refused to allow the child in the *791 home. Both the caseworker and the police tried to convince the mother to resume care of the child. She refused, however, stating adamantly that she was going to place the boy in foster care to teach him a lesson. Accordingly, she signed the voluntary placement instrument and the child entered foster care where he remained until June 24, 1983, when his mother took him home.
The issue presented to the court is whether a child may properly be placed in foster care simply as a punishment devised by the parent.
This proceeding is governed by the provisions of section 358-a of the Social Services Law. Pursuant to that statute, the preliminary inquiry must be whether the placement instrument was executed “knowingly and voluntarily” and because the parent “would be unable to make adequate provision for the care, maintenance and supervision” of the child in the home. (Social Services Law, § 358-a, subd [3].) If this criteria is satisfied, the court must then determine whether the best interests of the child would be promoted by his removal from the home and the placement in foster care. (Social Services Law, § 358-a, subd [3]; Matter of Tommy G., 119 Misc 2d 520.)
A reading of the applicable statute compels the conclusion that the Legislature intended voluntary foster care placements for the use of parents who are “unable” to meet their responsibilities to their children. (Matter of Meena B., 107 Misc 2d 684.) If the legislative intent were to sanction foster care on demand of the parent, there would be no need for the court to inquire beyond the issue of the voluntariness of the signature in the placement instrument. Furthermore, the use of the word “unable” and the absence of the word “unwilling” militates against a system of foster care by parental fiat.
Where a parent is simply unwilling to discharge his or her obligations to a child, the State is, of course, required to intervene to protect the child’s interest. Such intervention must, however, be by way of a child protective proceeding under article 10 of the Family Court Act and not through a voluntary placement.
To that end, the caseworker herein should have informed the natural mother of her parental obligations to the child *792 and insisted that she discharge them. And, upon her refusal, she should have been told that a child protective proceeding under article 10 of the Family Court Act would be initiated for her failure “to exercise a minimum degree of care” in providing the child with “proper supervision and guardianship.” (Family Ct Act, § 1012, subd [f], par [i], cl [B].)
This court is well aware that the child protective services have, and must continue to have, discretion as to when to initiate a proceeding under article 10 of the Family Court Act. (See Social Services Law, § 424; Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act, § 1011, 1982-1983 Supp Pamph, p 448.)
However, in the instant case, the question of such discretion does not arise since the only permissible State intervention was a child protective proceeding. Parental inability to care, a requisite for a voluntary placement, has not been established herein.
The foregoing necessarily raises the question of why the voluntary placement instrument was accepted by the Department of Social Services in the first place. The caseworker testified under oath that, in her opinion, the voluntary placement was not in the child’s best interest, a fact that is, itself, dispositive of the present petition. And yet, the caseworker accepted the instrument, thereby permitting the natural mother to utilize the voluntary foster care system for a patently impermissible purpose. There are enough parents abdicating their responsibilities to their children without the city supplying them with what amounts to a blank check on the taxpayers’ account.[1] Furthermore, to subject a 10-year-old child to a foster care “punishment” because he ran away from home is unconscionable. The fact that the natural mother was so disposed is no reason to make the city and its taxpayers the partners to her folly.[2]
*793 This case once again points out the need to require judicial approval of voluntary placements at the time they take place or, at the very least, a day or two thereafter. Under current procedure, a petition to approve a voluntary placement need only be filed within 30 days of the placement. (Social Services Law, § 358-a, subd [1].) This, coupled with notice requirements (Social Services Law, § 358-a, subd [4]; § 384-c), results in the actual hearing never taking place until several weeks after the placement. In many cases, as here, the child has already been discharged by the time the court hearing occurs.
Where discharge precedes the hearing, the court proceeding is without purpose. By denying the petition to approve the placement, as the court must herein, absolutely nothing is accomplished. Since the child has already been discharged, the denial of the petition has no effect on him. Nor is there any available sanction to be imposed against the Department of Social Services for accepting the placement. Denial of State reimbursement for funds expended, the sanction contained in section 358-a of the Social Services Law, is only applicable prospectively from the date the petition is denied (Social Services Law, § 358-b). Accordingly, such reimbursement will be forthcoming up to the date the petition is denied. Since discharge has already occurred there will be no denial of reimbursement and, hence, no sanction for violating the rules governing foster care placements. Obviously, this situation cries out for legislative action now! The petition is denied.

. As of May, 1983, there were 20,159 children in foster care in New York City. The total number of active cases were 18,164. (Statistical Report Series: Report of Variable Characteristics for New York City Children in Foster Care, Table A, Child Welfare Information Services, pub STAT 100P.) Foster home care costs approximately $8,000 annually per child. Congregate care (group homes, etc.) costs approximately $20,000 per child per year. (See New York State Foster Care Services Ceilings on State Aid Rates through June 30, 1983, New York State Department of Social Services.)

. State and Federal reimbursement covers about two thirds the cost of foster care so the city still must bear the cost of the remaining one third. (Redirecting Foster Care: A Report to the Mayor of the City of New York, Mayor’s Task Force on Foster Care Services, June, 1980, p 80.)