OPINION OF THE COURT
Richard M. Berman, J.
The respondent father is before this court on a petition, dated September 5, 1996, which alleges in count 4 that "Respondent father has refused to provide for the child, James, beyond court-ordered support payments, despite his knowledge that the child had no shelter.”
The respondent mother had, on October 22, 1996, submitted herself to the jurisdiction of the court, pursuant to Family Court Act § 1051 (a), and the court thereupon entered a finding of neglect against her in accordance with the petition’s allegations, to wit: (i) respondent mother has refused to allow child, James R. (born Sept. 3, 1984), to live in her home since approximately March 20, 1996. The child has had to find shelter on his own; (ii) respondent mother has failed to provide clothing, money, food and shelter for the child, James, who has been residing with relatives since March 1996; (iii) respondent mother failed to provide the child, James, with necessary counseling and therapy, which had to be initiated by relatives providing care for the child; and (iv) respondent mother has refused to cooperate with necessary counseling for the child.
The court heard testimony from Joseph Udo, a caseworker of the Administration for Children’s Services (hereinafter ACS), and from the respondent father. The court had ample opportunity to observe the witnesses’ demeanor and to assess their credibility.
A central issue before the court is whether the respondent father, a noncustodial parent, had an obligation to provide for the care and custody of his child when the custodial parent (mother) failed to act in the child’s best interest thereby endangering the child, where respondent father knew or should have known of his son’s extreme vulnerability and distress; where respondent father enjoyed regular contact (visitation) with his son; and where there appears to be no compelling reason (i.e., no insurmountable barrier) for the respondent father not to assume his parental duties. The court answers this question — unequivocally—in the affirmative.
The court credits the testimony of both witnesses and finds the following facts, among others, by the overwhelming *135 preponderance of the evidence: (i) the respondent mother obtained custody of the child, James, in the parties’ divorce in 1986; (ii) on or about March 20, 1996, the respondent mother refused to allow the child, James, to continue to reside in her home; (iii) from approximately March 20, 1996 to September 4, 1996, the child, James, resided with his paternal grandmother; (iv) on or about August 16, 1996, an oral report transmittal (hereinafter ORT) was called in to the New York State Department of Social Services State Central Register by a social worker at the Woodside Family Development Center; (v) the respondent father has paid his court-ordered child support payments; and (vi) on or about September 4, 1996, the respondent father refused to provide for the care and custody (i.e., shelter) of his child despite the request of the Administration for Children’s Services that he do so when the paternal grandmother could no longer care for the child.
The respondent father’s position is that he is paying child support and that is the limit of his obligation to his child. He states that he has a new job and new wife, and that he will not undertake the care and custody of his son. The respondent father testified that when told by the caseworker that his son had no place to go, he told the caseworker, "I think you’d better talk with his mother because under this signed documentation is what I’ve been leaning upon for the past 12, 13 years.” (Mar. 11, 1997 transcript, at 85, lines 8-11.) Respondent’s exhibit No. 1 into evidence is the signed document referred to which states in pertinent part: "James * * * will be in the full responsibility of his mother * * * child support payments will be 20.00 per week * * * Jose R. may see James * * * only two days a week from 12:00 noon until 8:00 that evening.”
The respondent father enjoyed extensive and frequent visitation with his son. He testified that he has had visitation every year except for the year he was incarcerated. Indeed, he said that he always visited with James and has had continuous contact with James throughout his (James) life;[1] that James would stay at his house; that he saw him "more frequently [last summer] because of the problems he was having” (Mar. 11, 1997 transcript, at 74, lines 22-23); that he would "pick him up to stay with my brothers” (Mar. 11, 1997 transcript, at 75, lines 2-3). Thus, the relationship between father and son was substantial and ongoing.
*136 The respondent father is and has been aware of the fact that his child has a history of disruptive behavior in school and at home, e.g., that he has assaulted his cousins and his paternal grandmother. The ORT states, in part, the following: "James is living in grandmother’s home and is under her care. Grandmother can’t control this boy. He runs away, he has been suicidal at times and he physically attacks Bernard, Jonathan [siblings] and the grandmother * * * James’ mother is a drug abuser; she is homeless.” (Emphasis added.)
The respondent father testified that he was aware of the problems his child was having with both the respondent mother and, subsequently, with his own mother, the paternal grandmother.[2] Indeed, it is clear, and the court further finds, that the respondent father knew or should have known all of the following facts: (i) that the respondent mother could not control her child; (ii) that the paternal grandmother could not control the child; (iii) that his son had no place to live on September 4, 1996, and, in fact, had been thrown out of his mother’s home on March 20, 1996; (iv) that his son was living with respondent’s mother, the paternal grandmother, from March 20, 1996 until September 4, 1996, and was causing difficulty in that household; (v) that his son was having difficulties in school; (vi) that his son was a very troubled young boy and that he was perhaps "suicidal”; (vii) that his son had run away from respondent mother’s home and from the paternal grandmother’s home on several occasions; (viii) that his son was having fights with his siblings; (ix) that his son needed his father’s help, attention and supervision; (x) that his son did not like living with the respondent mother because of all the people "12 or 15 people at home, which is a boyfriend that the mother has now” (Mar. 11, 1997 transcript, at 80-81); and (xi) that his son had been "beat up” by the respondent mother.
The Family Court Act defines a neglected child as a child under the age of 18 years "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum *137 degree of care”. (Family Ct Act § 1012 [f] [i].) James R. is clearly a neglected child within the meaning of the Family Court Act.
Historical perspectives notwithstanding, "[a] child is not the parent’s property, but neither is a child the property of the State * * * Looking to the child’s rights as well as the parents’ rights to bring up their own children, the Legislature has found and declared that a child’s need to grow up with a 'normal family life in a permanent home’ is ordinarily best met in the child’s 'natural home’.” (Matter of Michael B., 80 NY2d 299, 309 [1992].)
A corollary proposition is equally valid. That is, the rights of parents to, for example, visit, educate, and supervise their children, are counterbalanced by corresponding parental obligations to provide for their children’s well-being. Family Court Act § 1011, which outlines the purpose of article 10, reads in pertinent part as follows: "It [article 10] is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.”
In cases of child neglect or abuse, a noncustodial parent may be held responsible where there is some harm done to the child and where the noncustodial parent was in a position to help. In Matter of J. Children (57 AD2d 568 [2d Dept 1977]), the father, who had sufficient contact with the child, was responsible for the child’s injuries that occurred in his absence. In Matter of C. B. (81 Misc 2d 1017 [Fam Ct, Monroe County 1975]), it was held that jurisdiction over the noncustodial parent could be obtained if proven that he knew of the mother’s "inclination” to neglect the child. In Matter of Maureen G. (103 Misc 2d 109 [Fam Ct, Richmond County 1980]), the noncustodial parent denied liability for the abuse which lead to the child’s death since he was not legally responsible for the child. The court held, however, that the noncustodial father "knew or should have known that his son’s health, and, ultimately, his very life, was in jeopardy * * * He saw or should have seen a child dying, and offered no help, made no complaint, sounded no alarm.” (Matter of Maureen G., 103 Misc 2d, at 116.) "And it is by this omission that Michael G. [the noncustodial parent] violated his paternal obligation to protect his child from recognizable harm.” (Supra, at 116-117.)
In the instant case, similarly, it was easy to conclude that untold harm would come to James as a result of his being "abandoned” (rendered homeless) by his mother and of not being adequately supervised and cared for while in her custody *138 (and also while briefly in the custody of respondent father’s mother). In fact, as noted, James was said to have been "suicidal”.
The respondent father "relies” on an agreement between him and the respondent mother executed in 1986. That agreement states: "James R. will be the full responsibility of his mother, Vivian L.” (Respondent’s exhibit No. 1.) Case law is clear that the welfare of children cannot be determined merely by parents’ stipulations. The "best interests” of the child is the standard to be applied. (See, Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]; see also, Santoro v Santoro, 224 AD2d 510, 511 [2d Dept 1996] [wherein the Court stated: "We note that while the original agreement between the parties placing custody of Christine with the mother is entitled to solemn consideration, it cannot bind the court to a disposition other than that which a weighing of all the factors involved shows to be in the child’s best interests”]; Fanelli v Fanelli, 215 AD2d 718 [2d Dept 1995]; DeCaprio v DeCaprio, 219 AD2d 575, 576 [2d Dept 1995] [wherein the Court stated: "No one factor is determinative of whether there should, in the exercise of sound judicial discretion, be a change of custody, including the existence of an earlier decree or agreement”].)
The respondent father not only knew of James’ difficulties but he also recognized a possible solution. He testified that his son, James, would have been better off if he (the respondent father) had raised him. (See, Mar. 11, 1997 transcript, at 71 [wherein respondent father stated, "We don’t , raise our kids to be in the situation he’s in now”]; at 91, lines 15-17 [wherein respondent father said, "I don’t know the way she’s raising him up, because, if I raised the child he wouldn’t be in this condition”].) Clearly, it would have been in James’ "best interests” for his father to have become more involved in his life. Parents do not cease to be parents when there is a divorce or separation between them. The ongoing obligations of a parent to provide for the emotional and physical well-being of a child— especially, as in this case, a child in distress — ends with the emancipation of the child, or the death of the parent or child, or the formal termination of parental rights. "Where a parent is simply unwilling to discharge his or her obligations to a child, the State is, of course, required to intervene to protect the child’s interest.” (Matter of William S., 120 Misc 2d 790, 791 [Fam Ct, NY County 1983].) The respondent father here cannot .disavow his responsibilities to his son simply because he agreed with the mother in 1986 that she would have *139 custody, especially because he knew James was in extremis and was in a position to help.
The Commentaries to Family Court Act article 10 support this conclusion. "In our society, parents have the prime responsibility of caring for children. The family’s right to privacy and to be left alone are well established * * * Society intervenes into family life against the wishes of parents only when they are unwilling or unable to care adequately for their children.” (Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1011, at 217.) The State must develop a balance between individual life-styles and the protection of children in our society. (Ibid.) " '[Diversity’ in practices and beliefs as to how to raise a child is 'not a proper matter of governmental regulation so long as certain basic standards [are] not violated.’ * * * By establishing the ’'minimum degree of care’ test, the Family Court Act seeks to set a minimum baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet. ” (Bersharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1012, at 241 [emphasis added].) "[P]arental behavior must be evaluated objectively. Thus, the test is whether a reasonable and prudent parent would have so acted (or failed to act) under circumstances then and there existing. Good faith, good intentions, and even best efforts, are not, per se, defenses to a child protective petition. To hold otherwise would immediately frustrate legislative efforts to prevent avoidable injury to children.” (Matter of Katherine C., 122 Misc 2d 276, 278 [Fam Ct, Richmond County 1984] [emphasis added].)
Custodial and noncustodial parents have an obligation to be concerned about the welfare of their children. (See, Matter of J. Children, 57 AD2d 568, supra; Matter of Maureen G., 103 Misc 2d, supra, at 117 [wherein the court stated that "article 10 of the Family Court Act is grounded on a fundamental policy that parents are the primary protectors of their children. Society depends on and demands their vigilance. If parents fail in this vigilance to a degree which is rationally deemed to be dangerous, society, through the State, must intervene.”]) Parents may not allow their children to be placed in harm’s way just because they are no longer the custodial parent. The courts have been nearly unanimous in relying upon Family Court Act § 1013 (d) to support the contention that a child need not be in the care or the custody of the parent against whom charges of alleged abuse or neglect may be made. (Be *140 sharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1013, at 288.) "To sustain a petition of abuse or neglect against a parent, that parent need not be a 'person legally responsible’ for the subject child. It is only necessary that petitioner prove that the separated parent had sufficient contact with the child so as to make his action or inaction responsible for the child’s injuries.” (Matter of Maureen G., 103 Misc 2d, at 116.)
Here, the respondent father cannot simply refuse to care for (i.e., shelter) his son. (See, Matter of Keith R., 123 Misc 2d 617, 620-621 [Fam Ct, Richmond County 1984] [wherein the court stated: "Parents are responsible, in the first instance, for the welfare of their children. They are, and must be held to be, the first line of defense against injury and impairment. The right of parents to raise their children and control their upbringing is fundamental and entitled to protection as a matter of constitutional law * * * The corollary to that right is the responsibility of the parent to safeguard the child. And where parents fail to meet that responsibility, the State may properly intervene to protect the child.”])
Options available to the respondent father here were to assume — even if temporarily — care and custody of his child or to work with the Administration for Children’s Services to develop a plan for the appropriate placement of his son. That is, if he could not assume the responsibility for his son’s future, the respondent father, together with the ACS caseworker, could have made plans for either a voluntary placement with ACS, or for a voluntary surrender of parental rights, pursuant to Social Services Law § 384-a. (See, Matter of William S., 120 Misc 2d, supra, at 791.)
What the respondent father may not do is "do nothing”. A fact-finding order of neglect has been entered against the respondent mother; she is not, at this point, a viable resource for James. No other relative has come forward to seek custody of the child. Therefore, the sole available resource for the child is the respondent father. At this time, he may not satisfy his parental obligation towards the child by relying only upon his noncustodial agreement.
For all of the above reasons, the court makes a finding of neglect against the respondent father by a preponderance of the evidence. Pursuant to Family Court Act § 1012 (f) (i) (A), he *141 has failed to supply his child with adequate shelter, food, and clothing, though able to do so, and failed to offer financial or other reasonable means of support.

. See, March 11, 1997 transcript, at 79, lines 19-20: "Whenever you could, so you did have visitation?”; line 21: "Right”; at 80, lines 3-4: "Throughout his life?”; lines 5-6: "Right, I took him to car shows, this and that.”

. See, e.g., March 11, 1997 transcript, at 67, lines 21-25: "that the kid was becoming uncontrollable, violent, according to the mother’s statement, which was also seen at my mother’s house during frequent visits over there and he’s become uncontrollable.” See also, at 81, lines 4-6: "So your son told you he didn’t like living with his mother?”; lines 7-10: "He doesn’t like that environment of going from here to there to one room, one week, kicked out, going to another house the next.”